UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UZOMA KALU, <br><br> Plaintiff, <br><br> v. <br><br> INTERNAL REVENUE SERVICE, *et al.*, <br><br> Defendants. | Civil Action No. 14-998 (JEB) |

MEMORANDUM OPINION

Plaintiff Uzoma Kalu thinks her name might appear on some form of watch list maintained by the Federal Bureau of Investigation. She wants to confirm whether this is so, but the FBI has refused to provide an answer. Kalu then sued the Bureau – and two other agencies not relevant here – under the Freedom of Information Act to compel a response. In previously addressing the parties' initial cross-motions for summary judgment, the Court required further briefing on the FBI's argument for nondisclosure. That having been accomplished, the Court now concludes that the Bureau is entitled to keep mum on the issue of whether Kalu's name does or does not appear on any of its watch lists. It will thus deny Plaintiff's Renewed Motion for Summary Judgment and enter judgment in favor of Defendant.

I.  Background

Kalu, an Ohio physician, believes that she has erroneously been the target of a number of federal investigations. See Kalu v. IRS (Kalu I), No. 14-998, 2015 WL 4077756, at *1 (D.D.C. July 1, 2015) (this Court's prior Memorandum Opinion granting in part and denying in part parties' cross-motions for summary judgment). Having experienced a number of unpleasant interactions with federal agents – for instance, additional security screenings by the

Transportation Safety Administration when traveling by plane and "unusual" tax audits conducted by the Internal Revenue Service – she wanted to see whether "there [wa]s some type of error in . . . federal agencies' records pertaining to [her], which has for some reason mistakenly caused [these] federal investigatory actions." See ECF No. 17, Attach. 2 (Declaration of Uzoma Kalu), ¶ 4.

She submitted FOIA requests to TSA, the IRS, and the FBI, see Kalu I, 2015 WL 4077756, at *1, although only the latter's response is at issue here. She initially asked the Bureau for all records listing her name or otherwise describing her. See id. at *2-3. The FBI responded by letter, saying that it had conducted a search of its central database but had identified no records responsive to her request. See id. at *2. The letter also added what is known in FOIA parlance as a *Glomar* response (explained more fully below), meaning that the agency "neither confirm[ed] nor denie[d] the existence of [Kalu's] name on any watch list" it maintained, because it believes that disclosing whether or not it has records with her name on it could compromise law-enforcement operations. See ECF No. 11, Attach. 2 (Declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section, FBI), ¶ 7. According to the FBI, its *Glomar* response to such requests was "standard practice" that was supported by, among other things, "FOIA exemption (b)(7)(E)" – often referred to as Exemption 7(E) – which permits non-disclosure of certain law-enforcement information. See id.; see also 5 U.S.C. § 552(b)(7)(E).

Finding the "neither confirm nor deny" response more concerning than the Bureau's assertion that it had not located any other, non-watch-list documents featuring her name, and having lost her administrative appeal within the agency, see Hardy Decl., ¶¶ 8-10, Kalu filed this suit against the FBI (and the other two agencies) in order to receive a definitive response as to

whether she was "on the list" or not.

In Kalu I, after dispensing with the issues pertaining to TSA and the IRS, see 2015 WL 4077756, at *4-10, the Court concluded that lingering questions remained about the FBI's response to Kalu's request. See id. at *11. It thus denied both Kalu's and the FBI's cross-motions for summary judgment. See ECF No. 26 (July 1, 2015, Order). Shortly thereafter, the Court ordered the Bureau to "file a supplemental declaration" substantiating its "response to Plaintiff's FOIA request." Minute Order of July 30, 2015. After the FBI submitted the supplemental declaration of David M. Hardy, the parties stipulated in a joint status report that "the only remaining issue . . . is whether [the FBI] may rely upon FOIA exemption (b)(7)(E) to support that agency's response to Plaintiff's . . . FOIA request on the basis presented by the Supplemental Declaration of David M. Hardy." ECF No. 33 (Joint Status Rep.). In other words, the FBI's search for non-watch-list documents is no longer disputed. The Court may thus focus exclusively on the propriety of the Bureau's *Glomar* assertion.

**II.     Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials

in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

### III. Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to

the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted). The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. See 5 U.S.C. § 552(b); Rose, 425 U.S. at 361. Consistent with this statutory mandate, federal courts possess jurisdiction to order the production of records that an agency improperly withholds. See 5 U.S.C. § 552(a)(4)(B); Reporters Comm. for Freedom of the Press, 489 U.S. at 755.

In certain circumstances, however, an agency may refuse to confirm or deny that it has relevant records. This is called a "*Glomar* response," in reference to the CIA's refusal to confirm or deny whether it had records about the *Hughes Glomar Explorer*, a ship later revealed to have been involved in a Cold War mission. See Phillippi v. CIA, 546 F.2d 1009, 1011 (D.C. Cir. 1976); Am. Civil Liberties Union v. CIA, 710 F.3d 422, 426 n.1 (D.C. Cir. 2013) (ACLU). *Glomar* responses are appropriate when disclosing the existence (or nonexistence) of responsive records would itself "'cause harm cognizable under [a] FOIA exception.'" Wolf v. CIA, 473 F.3d 370, 374 (quoting Gardels v. CIA, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).

In such instances, the Government must show that the mere fact of whether it has (or does not have) relevant records is protected from disclosure under an exemption. See Wolf, 473 F.3d at 374. It must do so on the public record, "explaining in as much detail as is possible" why it cannot provide a definitive response. Phillippi, 546 F.2d at 1013; see Elec. Privacy Info. Ctr. v. NSA (EPIC), 678 F.3d 926, 931 (D.C. Cir. 2012). Courts considering *Glomar* responses apply the exemption standards developed in non-*Glomar* cases to determine whether the

information is properly withheld.  See Wolf, 473 F.3d at 374 (citing Gardels, 689 F.2d at 1103-05).

In its renewed Motion, the FBI relies exclusively on Exemption 7(E) to justify its *Glomar* response.  Under that exemption, an agency may refuse to disclose

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

5 U.S.C.§ 552(b)(7) (emphases added).

As an initial matter, Plaintiff "does not dispute . . . that the records of the FBI pertaining to any watch list activity are 'law enforcement records' pursuant to FOIA exemption (b)(7)." Renewed Mot. at 4.  The only question, therefore, is whether those records would disclose law-enforcement "techniques and procedures" or "guidelines" whose "disclosure could reasonably be expected to risk circumvention of the law."  § 552(b)(7).

Although the D.C. Circuit has not resolved whether the circumvention requirement applies only to "guidelines" or also to "techniques and procedures," see Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 205 n.4 (D.C. Cir. 2014), the requirement undisputedly "sets a relatively low bar for the agency to justify withholding." Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011).  "To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" Pub. Employees for Envtl. Responsibility, 740 F.3d at 205 (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  To give Kalu the benefit of the

doubt, the Court, for purposes of this Motion, will assume that the requirement also applies to "techniques and procedures."

The FBI's declarant, David Hardy, makes clear with reasonable specificity that the agency's *Glomar* response to Plaintiff's presence or non-presence on any FBI watch list is justified under Exemption 7(E). As he explains, the government's "consolidated Terrorist Watchlist," which includes numerous "sub-lists pertaining to various categories of criminal matters under investigation [including] the so-called 'No-Fly List'" is an essential tool used by the government to "identify known or suspected terrorists trying to obtain visas, enter the country, board aircraft, or engage in other activity." ECF No. 30, Attach. 1 (Supplemental Declaration of David M. Hardy, Section Chief of the Record/Information Dissemination Section, FBI), ¶ 5. According to Hardy, the watch list is "one of the most effective counterterrorism and law enforcement tools available" to the government. Id.

Although the existence of these lists has been public since 2002, "the criteria and standards for placing individuals on [them] have not been made publicly known." Id., ¶ 12. Disclosure of those criteria, the agency maintains, would "compromis[e] intelligence and security or invit[e] subversion of these lists by individuals who will seek ways to adjust their behavior to avoid being identified as a threat to aviation. Thus, the success of this antiterrorism tool depends in part on the confidentiality of the protocols for inclusion . . . ." Id.

To avoid disclosing these criteria – and consequently to prevent individuals from evading detection and investigation by law enforcement – the FBI has a standard practice "in responding to . . . FOIA/Privacy Act requests . . . by individuals for their own records . . . to include a standard *Glomar* response that neither confirms nor denies the existence of any watchlist information." Id., ¶ 6. This response serves numerous purposes. First, on a granular level, the

agency's "official confirmation" that a person's name is or is not on a list could "heighten an individual's suspicion, inducing him or her to more closely scrutinize activities and associations . . . ." Id., ¶ 13. It could also "induce an individual to flee, destroy or hide evidence, [and] alter his or her own behavior," as well as causing "his or her close associates, family members and friends to alter their behaviors in order to avoid detection by law enforcement." Id.

On a broader level, the FBI maintains that it cannot treat requests for disclosure of individuals who <u>are</u> on the list differently from those who are not – since "that differential treatment could itself be telling." Id., ¶ 14. Were the FBI to abandon its even-handed *Glomar* response, more information would land in the public domain from which individuals could inductively piece together what types of activities or behaviors may or may not attract the watchful eye of the federal government:

> [A]s pieces of information about who is or is not (or may or may not be) on a watchlist becomes known, adversaries can begin to construct a picture of what types of behavior are pertinent to placement on a watchlist and the extent to which the government is aware of adversaries and their activities. Such information would then allow them to develop countermeasures to conceal their activities and thwart efforts to interdict crime and protect the national security of the United States.

Id.

On the whole, the Court finds that the agency's supplemental declaration provides reasonable and sufficiently specific reasons to justify its *Glomar* response in this case – namely, that anything other than a "neither confirm nor deny" response would tend to disclose at the very least "guidelines for law enforcement investigations or prosecutions" and that such disclosure "could reasonably be expected to risk circumvention of the law." § 552(b)(7)(E); see Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) (affirming CIA's *Glomar* response under FOIA exemptions regarding classified material where the agency declarant's "affidavit persuasively

describe[ed], both generally and with reference to this case, the untoward consequences that could ensue were it required either to confirm or to deny" certain information). Indeed, among other adverse consequences of full or even partial disclosure is that "[r]equiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned." Gordon v. FBI, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005) (concluding that FBI's invocation of *Glomar*, grounded in FOIA Exemption 7(E), was appropriate in responding to plaintiffs' FOIA request for records concerning whether their names appeared on FBI watch lists); see also Vazquez v. U.S. Dep't of Justice, 887 F. Supp. 2d 114, 118 (D.D.C. 2012) (same as to other FBI databases) ("[P]ersons knowing that they are being investigated by a law enforcement entity, which the requested information would reveal, could reasonably be expected to use the information to circumvent the law."); accord Bassiouni v. C.I.A., 392 F.3d 244, 246 (7th Cir. 2004) (affirming CIA's *Glomar* response regarding requests for classified information and noting that, "[w]hen a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly. And this is what the CIA has done.").

    Kalu herself largely agrees, conceding that "the release of any information as to who is (or is not) . . . on the agency's watch list . . . could reduce the efficacy of that law enforcement program." Renewed Mot. at 5; accord Reply at 3 (agreeing that Hardy's supplemental declaration "merely establishes that there would be harm to the agency by disclosing whether or not Plaintiff is (or is not) on [its] watch list"). This concession undermines her central claim and effectively dooms her suit. See Morley v. CIA, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (concluding that the harms contemplated by Exemption 7(E) include not only the risk of

"circumvention of the law," § 552(b)(7)(E), but also the risk that disclosure would "render [law-enforcement] procedures vulnerable and weaken their effectiveness").

Pressing on, Kalu argues that even if a *Glomar* response is appropriate, the FBI must furnish her with "'[a]ny reasonably segregable portion of a record . . . after deletion of the portions of the record which are exempt.'" Renewed Mot. at 9 (quoting 5 U.S.C. § 552(b)). In so arguing, Plaintiff appears to "misunderstand[] the nature of a *Glomar* response, which narrows the FOIA issue to the existence of records *vel non*." EPIC, 678 F.3d at 934 (internal citation and quotation omitted). "[R]equiring [the agency] to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise." Id.; accord Phillippi v. CIA, 546 F.2d 1009, 1013 (D.C. Cir. 1976) ("When the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.").

In a last-ditch effort to save her claim, Plaintiff argues that the Bureau has waived its ability to invoke *Glomar* by publicly acknowledging that a watch-list program exists. See Renewed Mot. at 8. "[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." ACLU, 710 F.3d at 426-27 (citation and internal quotation marks omitted). To succeed in such an "official acknowledgement argument," the plaintiff must "bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." Id. at 427 (citation and quotation marks omitted). And, in the context of a *Glomar* response, Plaintiff must show "that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records." Id.

Plaintiff has made no such showing here. Certainly, she is correct that the Bureau does not deny the existence of a watch-list program. But to argue that such acknowledgement compels disclosure here is to mistake a forest for a tree. See Afshar v. Dep't of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983) (holding release of information that "provide[s] only the most general outline" of an intelligence effort does not waive right to withhold documents giving "a far more precise idea" of that effort because withheld information must have "already been specifically revealed to the public") (quoting Lamont v. Dep't of Justice, 475 F. Supp. 761, 772 (S.D.N.Y. 1979)) (internal quotation marks omitted). Plaintiff has not shown – as she must – that "the fact of the existence (or nonexistence)" of her name on a watch list has previously been disclosed. See ACLU, 710 F.3d at 427. That the watch list itself is public knowledge will not defeat the FBI's invocation of *Glomar* here. Cf. El Badrawi v. Dep't of Homeland Sec., 583 F. Supp. 2d 285, 315 (D. Conn. 2008) (finding improper agency's *Glomar* response to whether plaintiff was in violent-gang-and-terrorist-organization database in part because "the fact that [plaintiff] is in [that database] is public knowledge").

In sum, the FBI's declaration offers sound justifications for nondisclosure with "reasonable specificity of detail," which have not been "called into question by contradictory evidence in the record or by evidence of agency bad faith." EPIC, 678 F.3d at 931 (citation and quotation marks omitted).

**IV.    Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Renewed Motion for Summary

Judgment and enter judgment for Defendants.  A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 1, 2016